# JOHNIE VADEN ELROD, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17669-83. Filed November 12, 1986.

*Carrington Williams* and *Robert I. Waxman*, for the petitioner.

*Alan C. Levine* and *Thomas M. Cryan*, for the respondent.

STERRETT, *Chief Judge*: Respondent determined by notice of deficiency dated April 7, 1983, deficiencies in the Federal income taxes of petitioner for the taxable years ended December 31, 1975, and December 31, 1977, through December 31, 1980, as follows:

| Taxable year | Deficiency |
| --- | --- |
| 1975 | [1]$25,543.28 |
| 1977 | 138,016.00 |
| 1978 | 127,258.00 |
| 1979 | 158,030.00 |
| 1980 | 162,616.00 |

[1]The deficiency determined for 1975 is based upon respondent's disallowance of petitioner's 1978 net operating loss that had been carried back to the 1975 taxable year.

After concessions, the issues remaining for decision are (1) whether payments received by petitioner pursuant to an "optional sales contract" constitute taxable installment sale payments or nontaxable option payments, (2) whether petitioner is entitled to deduct certain payments as consulting fees incurred pursuant to a family partnership agreement, (3) whether petitioner is entitled to a charitable contribution deduction for conveyances made to the Commonwealth of Virginia, and if so, the value of such deduction, and (4) whether petitioner is entitled to a special allocation of partnership losses.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Johnie Vaden Elrod (Elrod) resided in Arlington, Virginia, at the time he filed his petition in this case. He filed Federal income tax returns for all of the taxable years in issue with the Internal Revenue Service Center in Memphis, Tennessee.

## Family Partnership Issue

Petitioner, an attorney with a real estate background, moved to Washington, D.C., from Murfreesboro, Tennessee, in 1931. Petitioner's father's principal occupation had been the purchase and sale of real estate, and petitioner had been exposed to and involved with many of his father's real estate transactions. Petitioner's father had been a large land owner in the Murfreesboro area until the 1930's, when he lost virtually all of his property during the Depression. In 1938, petitioner's father died, survived by petitioner, petitioner's mother (Mrs. Elrod), petitioner's brother, Dr. Robert Elrod (Dr. Elrod), and petitioner's sister and her husband, Gladys and Harvey Clark (the Clarks). Thereafter, Mrs. Elrod was taken care of by her children.

Approximately 2 or 3 years after her husband's death, Mrs. Elrod moved in with the Clarks and lived there until her death in 1974. The Clarks ran errands for her, paid for her groceries, and paid other miscellaneous bills. They did not maintain records of expenditures made on her behalf. Dr. Elrod also provided approximately $100 to $150 per month to the Clarks for her support. Petitioner did not contribute financially to his mother's care. However, petitioner said he would "make some of this up to" his brother and sister and vowed that each of them would be entitled to a 10-percent interest in the "net profits" from his real estate ventures.

Petitioner and his brother and sister did not execute any written agreement with respect to the formation of a family partnership. They did not file any Federal or State income tax returns on behalf of any partnership for any of the taxable years in issue. Also, they did not prepare any statements of their respective distributive shares of any partnership interests. However, in 1976, petitioner and his brother executed a Virginia certificate of trade name and partnership stating that petitioner and his brother and

sister were conducting business under the name of J.V. Elrod, Associates. Moreover, petitioner treated his brother and the Clarks as participants in a partnership or joint venture.

Petitioner discussed potential real estate investments with his brother and the Clarks during telephone conversations and in letters. In numerous letters, petitioner referred to his brother and the Clarks as his "counsel" and "advisors." In their correspondence, petitioner referred to their joint property interests, and in particular, petitioner's 1977 conveyance of certain land to Ernest W. Hahn, Inc. (Hahn), as discussed in greater detail in the option versus sale section below. Petitioner requested their "advice," "suggestions," and "recommendations" with respect to documents to be executed for the conveyance of this property. Dr. Elrod inspected the property on at least three occasions and appeared before the Prince William County board of supervisors on at least two occasions with respect to the development of the proposed shopping center on this site.

Petitioner also referred to his brother and the Clarks as his counsel in correspondence with Hahn. Moreover, the statement of sale executed with respect to the land conveyed to Hahn provided that a portion of the initial downpayment was payable directly to petitioner's brother and the Clarks. Also, payments upon the satisfaction of the promissory note executed with respect to the balance of the purchase price were payable directly to petitioner's brother and the Clarks. In 1977, petitioner paid a total of $126,300, one-half each to his brother and to the Clarks, as "consulting fees" incurred with respect to this sale of land to Hahn. In his calculation of the amount of gain realized on the sale, petitioner deducted the $126,300 as consulting fees incurred pursuant to the family partnership agreement.

## Option Versus Sale Issue

As of 1956, petitioner became the sole owner in fee of approximately 300 acres of land in Woodbridge, Virginia, located in Prince William County between Interstate Route

95 and U.S. Route 1 (the 300-acre tract).[1] Petitioner intended to develop this land for commercial use as a regional shopping center. In the early 1970's, petitioner engaged in negotiations with several major commercial real estate developers. At some time in 1972 or 1973, petitioner entered into an option agreement with Alfred Taubman with respect to the entire 300-acre tract for the construction of a regional shopping center. The option agreement provided for Taubman to pay an initial downpayment in the amount of $50,000, plus monthly option extension fees in the amount of $5,000. On his 1975 Federal income tax return, petitioner reported that this option had expired as of December 31, 1975. Approximately 6 months later, petitioner commenced negotiations with Earnest W. Hahn, Inc., a California corporation authorized to do business in Virginia, with respect to the development of a shopping center on this 300-acre tract.

On April 25, 1977, a document labeled "Optional Sales Contract" (the contract) was executed by petitioner, as seller, and Hahn, as purchaser, with respect to the transfer of approximately 100 acres of this 300-acre tract (the 100-acre parcel) as the site of a regional shopping center. The contract contained the following recitation:

2. Purchaser desires to purchase and Seller desires to sell a portion of Seller's Parcel, consisting of approximately 100 acres, and which is presently zoned so as to permit the construction and operation thereon of a regional shopping center, (hereinafter referred to as the "Shopping Center Site"). * * *

The contract also contained the following clauses:

1. Seller agrees to sell, transfer and convey to Purchaser and Purchaser, *subject to Purchaser's exercise of option as granted herein*, agrees to purchase from Seller all right, title and interest of Seller in and to the Shopping Center Site.

2. Seller represents that he is the owner in fee simple of the Seller's Parcel, including the Shopping Center Site, and that he has full power and authority to convey the premises as herein set forth and that the premises are clear, unrestricted, free, and unencumbered except as set forth * * * [therein].

\*　　\*　　\*　　\*　　\*　　\*　　\*

[1]The exact size of petitioner's property appears to be somewhere between 296 and 302 acres.

6. Purchaser may exercise this option, by written notice, to Seller, to be sent not later than 90 days after the execution hereof.
[Emphasis added.]

The property was transferred at $35,000 per net acre. The shopping center was intended to be of the following approximate boundaries: to the east—the proposed Weeks Road; to the west—Interstate Route 1; to the south—the new Dale Boulevard; and to the north—Optiz Boulevard. One million dollars was to be payable upon closing, of which $25,000 represented an earnest money deposit that was forfeitable as liquidated damages in the event that petitioner complied with the provisions of the contract but Hahn did not purchase the property for any reason or if the contract were terminated because of Hahn's default. The balance of the purchase price was to be evidenced by a nonrecourse, non-interest-bearing promissory note.

The contract further provided that—

12. At the Closing, Seller shall execute and deliver to Purchaser a good and sufficient general warranty deed, conveying good marketable fee simple title to the Shopping Center Site and all appurtenances thereto, free and clear of all liens and encumbrances except those set forth * * * [therein].

\* \* \* \* \* \* \*

14. Seller agrees to deliver possession and occupancy of the Shopping Center Site to the Purchaser free of all leases, tenancies, occupancies and improvements other than those improvements existing on the date hereof, and in the event that Seller shall fail to comply with this Section, on the Closing Date, Seller shall become and be thereafter a tenant by sufferance of the Purchaser and hereby waives all notices to quit, which may be provided by applicable law.

The contract required the formation of a limited partnership that would acquire title to the shopping center site. It also provided for an escrow account to be opened with a title company "for the purpose of consummating the purchase and sale of the Shopping Center Site." The contract also required petitioner to move, at his own cost and on an uncertain future date, 700,000 cubic yards of dirt from his adjacent property onto the shopping center site in order to level the land for the construction of the shopping center.

The contract also contained the following provisions:

22. Purchaser and Seller hereby agree that in the event that after the Closing Date, Purchaser shall be unable to proceed with the development of a regional shopping center on the Shopping Center Site, then, provided:

(a) Purchaser shall have satisfied any existing land or land development loans on the Shopping Center Site, and

(b) Title to the Shopping Center Site shall be in the same condition as existed at the Closing Date, *then Purchaser shall have the right to reconvey the Shopping Center Site to Seller, and Seller shall be entitled to retain the One Million ($1,000,000.00) Dollar down payment, and the Purchaser shall thereafter be relieved of all further liability under this Agreement,* and under the note and deed of trust. [Emphasis added.]

On August 19, 1977, petitioner and Hahn executed an amendment to the contract (the amendment). The amendment modified certain provisions of the original contract with respect to the 100-acre parcel. It reduced the purchase price of the 100-acre parcel by $175,000 and decreased the amount due on closing from $1 million to $825,000. The balance of the purchase price was determined to be $2.5 million, for which petitioner was to receive a promissory note. The statement of sale executed with respect to the 100-acre parcel directed a portion of the proceeds of this sale to be disbursed to petitioner's brother, Dr. Elrod, and to petitioner's sister and her husband, the Clarks.

Petitioner's conveyance of the 100-acre parcel cut off access to another portion of petitioner's property consisting of approximately 29 acres (the 29-acre parcel). The amendment required Hahn to purchase the 29-acre parcel, as follows:

1. Purchaser and Seller have established an escrow for the purchase of the Shopping Center Site as provided in the Optional Sales Contract and said purchase and sale is currently being accomplished in accordance with the terms of the Original Sales Contract. The parties contemplate that such sale will occur on or before August 24, 1977.

2. Seller agrees to sell, transfer and convey to Purchaser and Purchaser agrees to purchase from Seller, all right, title and interest of Seller in and to the approximately 29 acre portion of Seller's Parcel described * * * [therein]. Said portion of Seller's Parcel is hereinafter referred to as "the 29 Acre Parcel" and is designated as such * * * [therein].

3. Seller represents that he is the owner in fee simple of the Seller's Parcel, including the 29 Acre Parcel, and that he has full power and authority to convey the 29 Acre Parcel as herein set forth, and that title to said 29 Acre Parcel is clear, unrestricted, free and unencumbered.

The purchase price of the 29-acre parcel was calculated at $1,022,568.40, based on $35,000 per acre times 29.21624 acres. The entire amount was to be evidenced by a nonrecourse promissory note to be executed by Hahn and secured by a deed of trust. No downpayment was due upon the closing.

The amendment also modified the original contract to provide as follows:

Purchaser and Seller hereby agree that in the event that after the Closing Date, Purchaser shall be unable to proceed with the development of a regional shopping center on the Shopping Center Site, and if Purchaser does not desire to pay off the promissory note; then:

(a) Purchaser shall satisfy any existing land or land development loans on the Shopping Center Site, and

(b) Title to the Shopping Center Site shall be in the same condition as existed at the Closing Date, and *Purchaser shall reconvey the Shopping Center Site to Seller, and Seller shall be entitled to retain the Eight Hundred Twenty Five Thousand Dollar ($825,000.00) down payment, and the Purchaser shall thereafter be relieved of all further liability under this Agreement, and under the note and deed of trust.* [Emphasis added.]

The amendment also provided for petitioner to convey fee title to the 100-acre shopping center site to EWH Woodbridge Associates (EWH), the limited partnership to be formed by petitioner and Hahn. A written limited partnership agreement was executed concurrently with the closings on both the 100-acre and 29-acre parcels. Title to the 29-acre parcel was conveyed by petitioner directly to Hahn. The specific provisions of the EWH limited partnership agreement are discussed in detail in the special allocation of partnership losses section below.

On August 24, 1977, petitioner, as grantor, executed a deed to "grant, bargain, sell and convey, with General Warranty" the 100-acre parcel to EWH and represented that EWH was "to have quiet possession" of the land. EWH issued a promissory note to petitioner for the $2.5 million balance of the purchase price of the 100-acre parcel. The note was payable in full in 3 years from the earlier of its date of execution or upon the date of construction of the shopping center. Although the note purported to be a non-interest-bearing instrument, it provided for monthly payments of "option extension" fees calculated at an annual

rate of 6 percent of the outstanding note balance. The note also contained the following provisions:

In the event that * * * [EWH] shall elect not to proceed with the development of a Regional Shopping Center and * * * [EWH] does not desire to pay this Note in full, then:

1. * * * [EWH] shall reconvey the property securing this Note to * * * [petitioner]; and

2. * * * [EWH] shall satisfy any existing land or land development loans affecting the property; and

3. Title to the property shall be in the same condition as existed at the closing date;

Whereupon, the Deed of Trust Note shall be cancelled, the Deed of Trust securing this Note released, and * * * [EWH] shall thereupon be relieved of any further liability. * * *

EWH executed a deed of trust to "grant and convey," with general warranty of title, the 100-acre parcel to be held in trust to secure its payment of the $2.5 million note to petitioner. The deed of trust incorporated by reference all of the terms and provisions of the optional sales contract, as amended.

A second promissory note was executed on August 24, 1977, by Hahn, with respect to the 29-acre parcel. The note evidenced Hahn's promise to pay to petitioner the $1,022,568.40 purchase price of the 29-acre parcel plus "option extension" fees. Hahn also executed a deed of trust to "grant and convey," with general warranty of title, the 29-acre parcel to secure payment of this note.

Also on August 24, 1977, EWH issued a promissory note for a loan from United Virginia Bank/National (the Virginia bank) in the principal amount of $1.8 million (the bank loan). EWH also executed a deed of trust and security agreement to secure its payment of the bank loan. In this document, EWH represented that it held "good and marketable title in fee simple" to the 100-acre parcel, including its fixtures and personalty, "free and clear of any liens, charges, encumbrances, security interests and adverse claims whatsoever" except for certain "Permitted Encumbrances." Hahn agreed to guarantee unconditionally EWH's payment of the bank loan. In order of priority, the lien of the deed of trust that secured payment of the bank loan had priority over the lien of deed of trust with respect to the $2.5 million note issued by EWH to petitioner.

Three policies of title insurance were procured with respect to these conveyances of land. One policy, procured with respect to the 100-acre parcel in the amount of $3.5 million, vested title in fee simple in EWH, as the named insured, by virtue of the deed executed and delivered by petitioner to EWH dated and recorded on August 24, 1977. The policy was subject to the deed of trust from EWH to secure the $1.8 million bank loan and to the deed of trust from EWH securing its payment of the $2.5 million promissory note. The second policy, procured with respect to the 29-acre parcel in the amount of $1,022,568.40, vested title in fee simple in Hahn, as the named insured, also by virtue of the deed executed by petitioner to Hahn dated and recorded on August 24, 1977. Both title insurance policies were subject to several rights of way, including rights to the Prince William County board of supervisors, and were subordinate to the recorded memorandum of optional sales contract. The third policy, also procured with respect to the 100-acre parcel, was obtained by the Virginia Bank in the amount of $1.8 million, and stated that title was vested in EWH in fee simple but was subject to the deed of trust from EWH securing the bank loan.

As of the close of 1980, the last taxable year before the Court, the two notes issued by EWH and Hahn with respect to the 100-acre and 29-acre parcels remained outstanding. Further, construction of the shopping center had not commenced. The terms of both notes were extended on September 3, 1980, to mature as of July 31, 1981. During the period from August 24, 1980, through the new maturity date, the 6-percent option extension fees were changed to monthly option extension fees in the amounts of $20,833.33 and $8,521.40, with respect to the $2.5 million and $1,022,568.40 notes, respectively.

On December 23, 1981, petitioner received $2,529,354.73 in full payment of the $2.5 million note. Petitioner directed that the payment be distributed $252,935.47 each to Dr. Elrod and to the Clarks, with the balance to himself. Also on this date, the term of the $1,022,568.40 note was further extended to mature as of June 24, 1982. During the period from December 24, 1981, until its 1982 maturity date, its monthly option extension fees were increased to $12,782.10.

On June 24, 1982, EWH paid to petitioner the full balance of the $1,022,568.40 note with respect to the 29-acre parcel. As of June 3, 1982, EWH had satisfied the $1.8 million bank loan.

On petitioner's original 1977 Federal income tax return he reported a portion of the payments received in 1977 from EWH and Hahn pursuant to the optional sales contract, as amended, as long-term capital gains realized upon the installment sales of the 100-acre and 29-acre parcels. On his original returns for the 1978, 1979, and 1980 taxable years, petitioner reported "No Principal Payments" with respect to these "Installment Sales," although he reported that one parcel had been sold in 1977 for $3,325,000, while the other parcel was "still under contract."

On petitioner's original 1981 return he reported long-term capital gains with respect to the sale of the 100-acre parcel, stating that the sale had been settled on December 23, 1981. Petitioner reported that he did not realize any income with respect to the 29-acre parcel for 1981. On petitioner's original 1982 return, he also reported long-term capital gain on the sale of the 29-acre parcel, but included a statement prepared by a certified public accounting firm with reference to the optional sales contract. The statement provided that petitioner had "tentatively transferred" title to the 100-acre and 29-acre parcels in order to obtain financing for the shopping center and stated that the transfers were subject to a series of options that would cause title to the land to revert to petitioner if the shopping center were not built.

Petitioner subsequently amended his Federal income tax returns for the 1977 through 1982 taxable years. On petitioner's second amended 1977 return, received by respondent on February 24, 1983, petitioner characterized the $825,000 downpayment received with respect to the 100-acre parcel as payment for a long-term option. Petitioner also characterized the additional payments received, in the amounts of $50,000 and $20,451.36, as "option extension" fees. Petitioner's amended returns for 1978 through 1980, as well as for the 1981 and 1982 taxable years, characterized the monthly payments received in those years as extension fees from long-term options granted in 1977, which petitioner did not include in taxable income.

## Special Allocation of Partnership Losses

On August 19, 1977, a certificate of limited partnership and limited partnership agreement were executed with respect to the formation of EWH as a Virginia limited partnership, in accordance with the provisions of the Virginia Uniform Limited Partnership Act. The partnership was formed with Hahn as its general partner, holding a 95-percent partnership interest, and petitioner as its limited partner, holding a 5-percent partnership interest.[2] The stated purpose of the partnership was to "acquire and develop certain real property in Prince William County, Virginia," consisting of 100 acres of land "as a regional shopping center."

The partnership agreement specifically referred to certain provisions of the optional sales contract, as amended, discussed in the option versus sale section above. The partnership agreement stated that petitioner and Hahn each agreed to convey to EWH their respective interests in the 100-acre parcel, as the site of the proposed shopping center. It also stated that petitioner was to be paid 95 percent of the fair market value of this 100-acre parcel by EWH, and the remaining 5-percent value was deemed a contribution of capital.

Petitioner and Hahn valued petitioner's capital contribution at $175,000,[3] and petitioner's partnership capital account was credited with this amount. Petitioner's adjusted basis with respect to the 5-percent interest was $7,500.[4] Petitioner did not make any additional capital contributions of cash or property to the partnership during any of the taxable years in issue. However, petitioner's total adjusted basis in EWH included adjustments with respect to certain partnership liabilities.

---

[2] As of 1979, two other individuals joined the partnership, each holding 5-percent partnership interests as general partners, thereby reducing Hahn's capital interest to 85 percent.

[3] Presumably the $175,000 value was derived as follows: The total purchase price of the 95 acres sold pursuant to the conveyance of the 100-acre parcel equaled $3,325,000, that is, the $825,000 downpayment plus the $2.5 million promissory note, based on $35,000 per acre. Therefore, the value of 5 acres equaled $175,000 (5 × $35,000).

[4] The $7,500 amount was derived as follows: Petitioner's adjusted basis in the land sold pursuant to the conveyance of the 100-acre parcel equaled $142,500. However, petitioner sold only 95 percent of the 100-acre parcel. Therefore his basis in the land equaled $1,500 per acre ($142,500/95), and his basis in 5 acres equaled $7,500 (5 × $1,500).

The partnership agreement required the maintenance of partner capital accounts. It also provided that petitioner was to receive a distributive share of 5 percent of partnership profits and a special allocation of 25 percent of partnership losses. Upon liquidation of the partnership, proceeds were to be distributed in accordance with the partners' capital account balances and partnership assets were to be distributed in accordance with the Uniform Limited Partnership Act as then in effect in Virginia. There was no provision in the partnership agreement that required petitioner upon liquidation to restore any deficit in his capital account. In the event of petitioner's death, Hahn was to purchase petitioner's partnership interest at the agreed-upon price of $175,000, the value of petitioner's capital contribution to the partnership.

The partnership agreement contained the following provisions:

### ARTICLE 2

#### Partnership Property

Section 2.1 *Acquisition of Land.* The [100-acre parcel of] Land is presently owned in fee by Elrod, subject to Hahn's right to acquire title pursuant to an Optional Sales Contract dated April 25, 1977. Hahn and Elrod are, concurrently with the execution of this Partnership Agreement and recordation of the Certificate of Limited Partnership, conveying their respective interests in the Land to this Partnership, and the Partnership is assuming and agrees to pay and perform any and all obligations with respect to the Land as provided for in certain promissory notes and deeds of trust in favor of United Virginia Bank and Elrod respectively.

Section 2.2 *Title to Property.* The Property of the Partnership shall be held in the name of the Partnership.

### ARTICLE 3

#### Partnership Capital

Section 3.1 *Capital Contribution by Limited Partner.* The Land is concurrently herewith being conveyed to this Partnership by Elrod pursuant to the Optional Sales Contract dated April 25, 1977. The Partnership is paying Elrod a purchase price, which Hahn and Elrod agree represents the value of a ninety-five (95%) percent undivided interest in the land. The value of the remaining five (5%) percent undivided interest in the land is being conveyed by Elrod as a contribution to the capital of the Partnership at an agreed value of $175,000.00. No interest shall be payable on such contribution by Elrod.

\* \* \* \* \* \* \*

Section 3.5 *Capital Accounts*. The Partners shall have separate capital accounts to which their respective shares of Profit and Loss of the Partnership shall from time to time be credited or charged and withdrawals therefrom and all distributions of capital shall be in amounts from time to time agreed upon by the Partners, it being understood and agreed that all such distributions shall be in proportion to the respective Partner's Partnership Interest as provided in Section 4.1.

\* \* \* \* \* \* \*

## ARTICLE 4

*Partnership Interests* \* \* \*

Section 4.1 *Partnership Interests*. The interest of each Partner in the Partnership, hereinafter referred to as the "Partnership Interest" of such Partner, shall be as follows:

| | |
| ----------- | ---- |
| Hahn | 95% |
| Limited Partner | 5% |

\* \* \* \* \* \* \*

Section 4.3 *Profit and Loss*. \* \* \* The Profit and Loss of the Partnership shall be allocated to each Partner in proportion to each Partner's Partnership Interest; provided, however, that in consideration of Elrod having made the land available to the Partnership at extremely costly damage to the residue of the Elrod property, and Elrod's contribution of the value of a five (5%) [percent] undivided interest in the Land, Hahn and Elrod agree that so long as Elrod remains a Limited Partner in this Partnership, he shall be allocated twenty-five (25%) percent of any and all losses (for tax purposes) accruing to the Partnership. The remainder of such losses (for tax purposes), if any, shall be allocated to Hahn.

\* \* \* \* \* \* \*

Section 11.2 *Proceeds of Liquidation*. The proceeds from the liquidation of Partnership assets shall be divided in the following order:

1. The expenses of liquidation and the debts of the Partnership other than debts owing to the Partners shall be paid.

2. Such debts as are owing to the Partners, including loans and advances made to or for the benefit of the Partnership shall be computed. Such amounts shall be paid after offsetting capital deficits, if any, against the amount owing to the Partners.

3. The balance in each Partner's capital account shall be paid after crediting or debiting such Profit and Loss as shall have accrued from the date of last posting to these accounts.

Subject to the foregoing, the business and affairs of the Partnership shall be wound up and its assets distributed in the manner provided in the Uniform Limited Partnership Act as the same may be in effect at the time in the State of Virginia.

Section 11.3 *Gain or Loss*. Any gain or loss arising out of the disposition of Partnership assets during the course of liquidation shall be

credited or debited to the Partners in the same proportions as Profit and Loss were distributed prior to liquidation.

Section 11.4 *Distribution.* After all of the debts of the Partnership have been paid, the Partners may elect, by mutual agreement, to distribute the assets of the Partnership in kind. The Partners shall evaluate such assets and distribution shall then proceed as if the assets were being distributed in cash.

Section 11.5 *Inability to Proceed with Shopping Center Development.* In the event Hahn decides, in its sole and absolute discretion, not to proceed with the proposed regional shopping center project and elects to cause the Partnership to reconvey the land to Elrod pursuant to the provisions of the Optional Sales Contract, dated April 25, 1977, entered into by Hahn and Elrod, the Partnership and each of the Partners shall execute such deeds and other documents as Hahn's counsel deem reasonably necessary or appropriate to convey the land to Elrod, and this Partnership shall thereupon be dissolved and terminated in accordance with the laws of the Uniform Limited Partnership Act of the State of Virginia.

EWH operated at a loss during all of the taxable years in issue. The amounts shown in the table on p. 1061 were reported on the Federal income tax returns filed by EWH and petitioner, for the 1977 through 1980 taxable years, with respect to EWH partnership losses and their allocation to petitioner.

## *Charitable Contribution Issue*

On February 14, 1979, petitioner deeded to the Commonwealth of Virginia (the State), in fee simple with general warranties, two unimproved parcels of land. One parcel consisted of approximately 10.191 acres (parcel A) and the other parcel consisted of approximately 0.082 acres (parcel B), for a total of approximately 10.273 acres. Also on this date, petitioner granted to the State certain easements over approximately 3.175 acres of his adjacent property.

The parcels deeded to the State and subject to the easements were located within the same 300-acre tract of land from which petitioner conveyed the 100-acre and 29-acre parcels to Hahn and to EWH, respectively, pursuant to the optional sales contract, as amended, discussed in the option versus sale section above. Specifically, parcel A was located to the east of Interstate Highway 95 (I-95), in the vicinity of Smoketown Road and Dale Boulevard. It also

| EWH partnership losses | Petitioner's capital contributions | Petitioner's capital account as of beginning of year | Losses allocated to petitioner | Losses deducted by petitioner | Petitioner's capital account as of end of year |
|---|---|---|---|---|---|
| 1977 | $106,275 | $175,000 | - - - | $26,569 | (¹) | $148,431 |
| 1978 | 314,371 | - - - | $148,431 | 78,593 | 78,593 | 69,838 |
| 1979 | 449,797 | - - - | 69,838 | 112,449 | 112,449 | (42,611) |
| 1980 | 612,036 | - - - | (42,611) | 153,009 | ²163,009 | (195,620) |

[1] Petitioner did not deduct any losses attributable to his interest in EWH on his original 1977 tax return, as he claims that he did not receive timely copies of his partnership Form K-1. However, on petitioner's amended return for 1977, he reported $26,569 as his distributive sharer of partnership loss and filed a claim for refund which respect to this amount.

In the notice of deficiency, respondent denied the claim for refund based upon the disallowance of the special allocation of partnership loss to petitioner. Respondent determined that petitioner was entitled to a 5-percent distributive share of partnership loss, in the amount of $5,314, and adjusted the amount of the determined deficiency for 1977 accordingly. Therefore, if we should find for petitioner on this issue, an appropriate adjustment must be made in the computations under Rule 155 with respect to the allowance of the 25-percent special allocation of partnership loss, in the amount of $26,569, for 1977.

[2] The amount of partnership loss deducted by petitioner for 1980 includes an additional $10,000 expense incurred by the partnership.

was the site of the proposed improved Dale City Interchange, which apparently was the I-95 exit ramp at Dale Boulevard. At the time that petitioner conveyed this land to the State, the existing "partial diamond-shaped" interchange was insufficient to sustain its traffic flow. The proposed relocated roads and improved interchange also were desirable for commercial development in that area, which included providing adequate access to the proposed regional shopping center site. The shopping center site had been zoned for commercial purposes prior to petitioner's conveyance of this land.

Parcel B and petitioner's adjacent property subject to the easements were located to the north of parcel A. Specifically, this land was in the vicinity of the proposed relocated Weeks Road and near the Potomac Hospital (the hospital). As of 1979, road access to the hospital was poor. Petitioner and his brother, Dr. Elrod, had discussed the need for improved access to the hospital. Petitioner conveyed parcel B and the easements to the State as the location of a portion of this improved access road.

The Prince William County board of supervisors desired, and in fact expected, petitioner and the other area landowners to convey their land to the State to effectuate the proposed improved interchange project. Although it was implied that the land might be taken by eminent domain, the probability of this happening was questionable, particularly since the funds necessary to purchase the properties would have depleted funding of the interchange project. On June 28, 1979, Hahn and EWH also each conveyed to the State by separate deeds two parcels of land consisting of approximately 5.832 and 5.65 acres, respectively, in fees simple with special warranties. These parcels are portions of the 100-acre and 29-acre parcels of land conveyed by petitioner to Hahn and EWH pursuant to the optional sales contract, as amended.

Petitioner claimed a charitable contribution deduction in the amount of $1,047,609 with respect to his 1979 conveyances to the State, which he elected to carry forward onto his 1980 Federal income tax return. The amount of the deduction was based on an expert real estate appraiser's valuation, which valued parcel A at $996,609, parcel B at a

$1,000 nominal value, and the easements, for a temporary 3-year period, at $50,000. In 1980, petitioner also deducted expenses in the amount of $3,500 for the appraisal fees.

### Deficiencies Determined

In the statutory notice of deficiency, respondent determined deficiencies in petitioner's Federal income taxes for the 1975 and 1977 through 1980 taxable years. The deficiencies determined for 1977 through 1980 were based upon respondent's (1) determination that petitioner failed to report amounts received as "extension fees" as installment sale interest income, (2) disallowance of petitioner's deduction of $126,300 as miscellaneous expenses for consulting fees incurred with respect to the family partnership agreement, which amount respondent allowed as selling expenses to reduce petitioner's capital gains, (3) denial of petitioner's deduction for the charitable contribution claimed and appraisal expenses deducted with respect to the conveyances of land and easements to the Commonwealth of Virginia, and (4) disallowance of the special allocation of EWH partnership losses to petitioner, which losses were further limited by respondent's determination of petitioner's basis in the partnership.[5]

In his amended petition, petitioner alleged that the $825,000 downpayment received in 1977 with respect to the optional sales agreement, as amended, constituted an option payment. Petitioner requested a refund with respect to such overpayment, which respondent denied in his answer. Pursuant to an order and memorandum sur order dated June 5, 1985, this Court granted respondent's motion for leave to file first amendment to answer. In the amended pleadings, respondent determined an increased deficiency for the 1977 taxable year, in the amount of $13,144, based upon the determination that petitioner is not entitled to deduct the $126,300 payment as selling expenses incurred with respect to the 100-acre and 29-acre parcels of land, as was permitted in the notice of deficiency.

---

[5] Petitioner has conceded that he failed to report certain interest income received from a savings and loan institution during the 1980 taxable year as also determined by respondent in the notice of deficiency.

## ULTIMATE FINDINGS OF FACT

(1) The optional sales contract, as amended, constitutes a completed sale and not an option agreement, and petitioner has failed to include in income, payments received pursuant to this agreement. Respondent correctly denied petitioner's claim for refund with respect to the initial downpayment on the sale.

(2) Petitioner and his brother and sister formed a valid family partnership and petitioner is entitled to deduct expenses incurred as consulting fees pursuant to the partnership.

(3) Petitioner's conveyance of land to the State as the site of the improved interchange and access road to the shopping center site does not constitute a charitable conveyance. Petitioner's conveyance of land and grant of easements to the State as the site of the improved hospital access road constitute charitable conveyances, and petitioner is entitled to a deduction with respect to such conveyances only.

(4) The special allocation to petitioner of 25 percent of partnership losses cannot be respected to the extent that it created deficit capital account balances that petitioner had no obligation upon liquidation to restore.

## OPINION

### Sale Versus Option Issue

The first issue for decision is whether the optional sales contract, as amended (the contract), constitutes a sale of the 100-acre and 29-acre parcels of land, as respondent contends, or is a mere option to purchase the property, as petitioner contends. Respondent has determined deficiencies in petitioner's Federal income taxes for the 1977 through 1980 taxable years based upon petitioner's failure to include in income, payments that respondent contends represent monthly interest payments received pursuant to a completed installment sale. Petitioner argues that the payments were received pursuant to a long-term option agreement, and as such are not properly includable in income for any of the taxable years in issue. Petitioner bears the burden of proving that respondent's determinations in the notice of

deficiency are incorrect. Rule 142(a);[6] *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

As a preliminary matter, we first must decide whether certain evidence submitted by petitioner is inadmissible based on the parol evidence rule, as respondent contends.[7] At trial, we sustained respondent's objections but this tentative ruling was rendered expressly subject to our consideration of arguments on brief to be submitted by both parties.

Throughout trial, respondent argued vehemently that *Estate of Craft v. Commissioner*, 68 T.C. 249 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979), required the exclusion of the parol evidence offered by petitioner with respect to the contract. However, on brief respondent abandons this argument and relies instead upon the rule set forth in *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). Respondent argues alternatively that the evidence must be excluded based upon the so-called "strong proof" rule. Respondent argues that the parol evidence is inadmissible under either rule because the contract is clear and unambiguous on its face. Respondent does not pursue the often asserted "substance over form" argument here, but rather contends that the contract constitutes a sale in form as well as in substance.

In *Danielson*, the Court of Appeals for the Third Circuit stated that—

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [*Commissioner v. Danielson*, 378 F.2d at 775.]

This Court has not adopted the *Danielson* rule as set forth by the Court of Appeals for the Third Circuit. *Coleman v. Commissioner*, 87 T.C. 178, 202 & n. 17 (1986); *G C Services Corp. v. Commissioner*, 73 T.C. 406, 412 & n. 2 (1979).

---

[6]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

[7]We note that petitioner also objects to the admissibility of certain testimony and exhibits offered at trial by respondent, based on the parol evidence rule. Of course, our resolution of this matter applies equally to objections raised by both parties.

Inasmuch as this case would be appealable to the Court of Appeals for the Fourth Circuit, we are not bound to apply this rule in the instant case. See *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The strong proof rule is a standard applied by this Court. *Coleman v. Commissioner, supra.* It requires the taxpayer to present "strong proof," that is, more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties. *G C Services Corp. v. Commissioner, supra* at 412.[8]

We find that the contract is far from clear on its face and in fact is very ambiguous. It contains language susceptible to interpretation either as an option agreement or as a completed sale, as discussed in greater detail below. As this Court has stated previously, neither the *Danielson* rule nor the strong proof rule are applicable to exclude parol evidence offered with respect to an ambiguous document. *Smith v. Commissioner*, 82 T.C. 705, 713-716 & n. 9 (1984). See also *Coleman v. Commissioner, supra* at 202 n. 18.

Additionally, we note that petitioner offers the evidence in dispute not to vary or contradict the terms of the contract but rather to corroborate and confirm his position that the contract is an option agreement and not a sale. We need not engage in a detailed review of this Court's dual approach to the parol evidence rule as set forth in *Estate of Craft v. Commissioner*, 68 T.C. 249, 259-264 (1977). However, for purposes of completeness, we note that *Estate of Craft* does not require the exclusion of evidence offered either to interpret the terms of a contract (*Estate of Siegel v. Commissioner*, 74 T.C. 613, 621 (1980)), or merely to explain the purpose and intention of the contracting parties (*Ellison v. Commissioner*, 80 T.C. 378, 394 (1983)). Therefore, we reject respondent's arguments to exclude the parol evidence offered by petitioner with respect to the optional sales contract, as amended.

The parties do not dispute the tax consequences of payments received pursuant to an option agreement. Option payments are not includable in income to the optionor until the option either has lapsed or has been exercised. *Kitchin*

---

[8]See also *Boseker v. Commissioner*, T.C. Memo. 1986-353.

*v. Commissioner,* 353 F.2d 13, 15 (4th Cir. 1965), affg. a Memorandum Opinion of this Court; *Virginia Iron Coal & Coke Co. v. Commissioner,* 99 F.2d 919 (4th Cir. 1938), affg. 37 B.T.A. 195 (1938); see sec. 1.1234-1(b), Income Tax Regs. The issue here is whether, for Federal income tax purposes, payments received by petitioner pursuant to the optional sales contract, as amended, constitute sale or option payments.[9]

As noted above, the contract is ambiguous on its face as it does not contain language that clearly is either an option or a sale. As this Court has stated previously—

the clear distinction between an option and a contract of sale is that an option gives a person a right to purchase at a fixed price within a limited period of time but imposes no obligation on the person to do so, whereas a contract of sale contains mutual and reciprocal obligations, the seller being obligated to sell and the purchaser being obligated to buy. [*Koch v. Commissioner,* 67 T.C. 71, 82 (1976); citations omitted.][10]

The contract refers to petitioner and Hahn as "seller" and "purchaser," respectively, and the contract provides that petitioner is to "sell, transfer and convey * * * all right, title and interest" in the land conveyed. Although terms such as "seller" and "purchaser" ordinarily are used only in bilateral sales instruments, an agreement nonetheless may constitute an option if its provisions enable the "purchaser" to withdraw from the agreement without incurring any additional liability. *Estate of Franklin v. Commissioner,* 64 T.C. 752, 767 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

The contract provides that the conveyances are subject to Hahn's "exercise of option" and refers to monthly payments due on the promissory notes, executed for the balance of the purchase price, as "option extension" fees. The original contract stated that, in the event that Hahn was unable to develop the land as a shopping center, it had the "right to reconvey" the property to petitioner and be relieved of further obligations. As amended, the contract provides that Hahn "shall reconvey" the land to petitioner if Hahn should "not desire to pay off" the promissory note.

---

[9]The original optional sales contract, executed on Apr. 25, 1977, set forth an initial 90-day option period. Apparently this option was exercised by Hahn, given that the contract was amended on Aug. 19, 1977.

[10]See also *Graney v. United States,* 258 F. Supp. 383, 386 (S.D. W. Va. 1966), affd. per curiam 377 F.2d 992 (4th Cir. 1967).

The EWH partnership agreement also provides that if Hahn, its 95-percent general partner, should decide "in its sole and absolute discretion" not to develop the shopping center, Hahn would cause the partnership to reconvey the property to petitioner and the partnership would be terminated.

Petitioner argues that Hahn has been granted the mere right to purchase the property at Hahn's option. Specifically, petitioner maintains that Hahn may satisfy its promissory note when due and retain the property conveyed, or alternatively, not pay off the note, reconvey the property, and merely forfeit the initial downpayment and any monthly payments already made. We disagree with petitioner's characterization of the transaction and, for the reasons set forth below, conclude that the conveyances made pursuant to the contract constitute a completed sale.[11]

First, the economic reality underlying the conveyances indicates that this is a sale. Petitioner received an $825,000 downpayment upon the closing, plus two promissory notes in principal amounts of $2.5 million, and $1,022,568.40, for a total purchase price of $4,347,568.40. The notes executed by Hahn and EWH, with respect to the 100-acre and 29-acre parcels of land, respectively, were due either in 3 years or upon the commencement of construction of the shopping center, whichever was earlier. The $825,000 downpayment equals approximately 20 percent of the total purchase price, which would have been a considerable sum to pay for the mere right to purchase property.

The notes required the payment of monthly "option extension" fees in the amount of 6 percent of their respective note principals. Respondent correctly characterizes these monthly fees as interest payments. Each note states, as in the contract, that if the purchaser does not desire to satisfy the note in full it shall reconvey the property to petitioner. However, the notes do not provide that the monthly payments are necessary to keep the option open such that the failure to pay a monthly fee when due would cause the option to lapse. Rather, the notes provided

[11]Cf. *Hicks v. Commissioner*, T.C. Memo. 1978-373. Although in *Hicks* the transaction was cast as a sale with the purchaser's option to reconvey the property to the seller, the parties apparently agreed that it was an option and the Court was in accord. Therefore, unlike the instant case, the proper characterization of the transaction was not in issue there.

that the failure to make the monthly payments or satisfy the principal payments when due would constitute a default of the note makers' obligations. In fact, petitioner's correspondence with Hahn reveals that on more than one occasion petitioner did not receive timely monthly payments and there is no evidence of any resulting lapse of the so-called "option."

Second, possession as well as the benefits and burdens of ownership were transferred in the conveyances. See generally *Frank Lyon Co. v. Commissioner*, 435 U.S. 561 (1978). Petitioner executed and delivered general warranty deeds with respect to both parcels of land, which were duly filed and recorded. EWH and Hahn each procured title insurance policies in which they represented that they held title in fee simple in their respective properties. Also, EWH represented in a bank loan guaranty that it held good and marketable title to the 100-acre parcel in fee simple. Real estate taxes levied on the 100-acre parcel were paid by EWH from 1977 through 1982, and the annual sum of the "option extension" fees were deducted by EWH as "ground rent" expenses in 1978 through 1980, which petitioner claimed as part of his distributive share of partnership losses.

Finally, we note that petitioner, an experienced real estate attorney, reported the transaction as a sale on his Federal income tax returns for the 1977 through 1982 taxable years. In 1977, petitioner included the $825,000 downpayment in income and paid the tax attributable thereto as long-term capital gains. Only in 1983, the same year in which petitioner was issued the notice of deficiency in this case, did petitioner file amended returns for each of these earlier years and report the transaction as an option. Petitioner's initial treatment of the conveyances from 1977 through 1982 is evidence of his intention at the time he entered into the transaction. *Graney v. United States*, 258 F. Supp. 383, 387 (S.D. W. Va. 1966), affd. per curiam 377 F.2d 992 (4th Cir. 1967). Petitioner's treatment of the transaction is particularly significant when compared to his treatment of an earlier agreement with another real estate developer that also provided for the construction of a regional shopping center on this same site. Petitioner did treat that transaction as an option for tax purposes.

On brief, petitioner also argues that, if the contract does not constitute an option, then it should be treated as a trust agreement. Petitioner contends that he conveyed the land to EWH, as trustee, to enable the partnership to acquire the necessary financing for the development of the shopping center. Respondent objects to petitioner's presentation of this new argument on brief, as no basis for the argument was made at trial through testimony or in statements of counsel or the parties' pleadings. We need not consider the merits, if any, of this argument since, for all of the reasons stated above, we have concluded that the optional sales contract constitutes a sales agreement. In any event, however, we need not consider this new argument raised for the first time on brief because of its surprise and prejudice to respondent. *Seligman v. Commissioner*, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986); *Foster v. Commissioner*, 80 T.C. 34, 220-222 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985).

Accordingly, we conclude that respondent correctly has denied petitioner's claim for refund with respect to the initial downpayment on the sale and determined deficiencies in petitioner's Federal income taxes for the 1977 through 1980 taxable years. Petitioner must include in income the monthly interest fees received pursuant to the optional sales contract, as amended, for the sale of the 100-acre and 29-acre parcels of land.

### *Family Partnership Issue*

The next issue for decision is whether petitioner is entitled to deduct certain expenses incurred with respect to a purported family partnership agreement. On his 1977 Federal income tax return, petitioner deducted business expenses in the amount of $126,300 for "Counsel and Advisory Fees." In the notice of deficiency, respondent disallowed the deduction as consulting fees, but determined that the expenses constituted allowable selling expenses. Petitioner bears the burden of proving that the expenses constitute consulting fees incurred pursuant to a valid family partnership agreement. Rule 142(a); *Cirelli v. Commissioner*, 82 T.C. 335, 342 (1984).

In his amended pleadings, respondent determined an increased deficiency in petitioner's 1977 tax based upon the disallowance of these expenses as deductible selling expenses, contrary to the determination made in the notice of deficiency. At trial, respondent argued first that there was no valid family partnership agreement, and second that these expenses constituted nondeductible personal expenses that arose out of a nonbusiness family relationship. On brief, respondent argues alternatively that the expenses constitute nondeductible gifts. Respondent bears the burden of proving that petitioner is not entitled to deduct these expenses as selling expenses as determined subsequent to the notice of deficiency. Rule 142(a); *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981).

The issue presented is whether the purported partnership will be recognized for Federal income tax purposes. As a general rule, the question is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742-743 (1949). Inasmuch as the issue here is whether a valid family partnership exists, we focus on section 704(e) and the regulations promulgated thereunder. The legislative history of the predecessor of section 704(e) reveals that the *Culbertson* business purpose test is of less significance in the family partnership setting. S. Rept. 781, 82d Cong., 1st Sess. 39 (1951), 1951-2 C.B. 458, 486; H. Rept. 586, 82d Cong., 1st Sess. 33 (1951), 1951-2 C.B. 357, 384. See also *Cirelli v. Commissioner*, *supra* at 344-348. Moreover, the regulations promulgated under section 704(e) also provide that, with the exception of a tax-avoidance motive, the motives underlying the transfer of a partnership interest in a family partnership are "generally immaterial." Sec. 1.704-1(e)(2)(x), Income Tax Regs.

Section 704 provides in relevant part—

SEC. 704(e). FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

Section 704(e)(1) applies where capital is a material income-producing factor. See sec. 1.704-1(e)(1)(iv), Income Tax Regs. Respondent concedes on brief that petitioner's holding of real estate for its future appreciation satisfies this capital requirement. Therefore, we must determine whether the other members of petitioner's family own capital interests in any such family partnership for purposes of section 704(e)(1).

The regulations promulgated under section 704(e)(1) set forth the basic tests of ownership used to determine whether an alleged partner is the "real owner" of a capital interest. Sec. 1.704-1(e)(2), Income Tax Regs. This determination must be made based upon all of the facts and circumstances, viewing the transaction as a whole. Sec. 1.704-1(e)(2)(i), Income Tax Regs.; *Buehner v. Commissioner*, 65 T.C. 723, 744 (1976).

Among the important factors to be considered in determining whether a purported partner has acquired ownership of a capital interest is the conduct of the partnership business. Sec. 1.704-1(e)(2)(vi), Income Tax Regs. Respondent relies in part on the fact that no Federal or State income tax returns were filed on behalf of the partnership. We acknowledge that the filing of required tax returns is one of several significant factors to be considered (sec. 1.704-1(e)(2)(vi)(*f*), Income Tax Regs.), and petitioner's failure to do so is not to be condoned. However, we also must examine other enumerated significant factors with respect to the conduct of the purported partnership business (sec. 1.704-1(e)(2)(vi)(*a*) - (*e*), Income Tax Regs.), such as whether the other family members were treated as partners in the operation of the partnership's activities.

At trial, testimony was received from petitioner, his brother, Dr. Robert Elrod, and their brother-in-law, Mr. Harvey Clark, with respect to the existence of the family partnership.[12] These witnesses each testified that, sometime in 1938 or 1939, petitioner had agreed that his brother and the Clarks each were entitled to share in 10 percent of the net profits realized on petitioner's then existing and future real estate investments, in order to "make it up to" them

---

[12]Petitioner's sister, Mrs. Gladys Clark, did not appear personally at trial but was questioned by counsel for both parties prior to trial.

for their care and support of petitioner's mother from the time she was widowed.

Respondent argues that this testimony consists entirely of self-serving and unsupported statements. However, we have observed the demeanor of these witnesses at trial and find them to be credible. Moreover, their testimony is corroborated by numerous letters written by petitioner to his brother that support the existence of a family partnership or joint venture. In these letters, petitioner refers to Dr. Elrod and the Clarks as his "counsel" and "advisors" and also mentions each of their 10-percent interests in petitioner's real estate investments. These writings are significant as they help to establish the nature of the partnership and the rights of the respective partners. See sec. 1.704-1(e)(2)(vi)(e), Income Tax Regs.

Respondent relies in part on petitioner's failure to execute a written partnership agreement upon the formation of the partnership in 1938 or 1939. Respondent also notes that there were no distributions of partnership income to petitioner's brother or sister from 1938 through 1976. However, in 1976, petitioner and his brother executed a Virginia certificate of trade name and partnership, stating that petitioner and his brother and sister were conducting business under the name of J.V. Elrod, Associates, which lends support to the existence of the partnership during the taxable year in issue, 1977. In any event, for Federal income tax purposes, a partnership agreement may be either written or oral. Sec. 1.761-1(c), Income Tax Regs. Petitioner also responds that, although his brother and sister were entitled to receive a certain percentage of the "net profits" realized on petitioner's real estate investments, until 1977 petitioner merely reinvested any proceeds from his ventures, as he says, "pyramiding" his investments. Petitioner contends that the first real profits realized from these investments were received in 1977 upon the conveyance of property to EWH and Hahn, pursuant to the optional sales contract, as amended, as discussed in the option versus sale section above.

Correspondence between petitioner and his brother and sister specifically refer to their joint property interests with respect to the conveyance of land pursuant to the optional

sales contract, as amended. In these letters, petitioner requests the advice, suggestions, and recommendations of his brother and the. Clarks with respect to negotiations between, and documents to be executed by, petitioner and Hahn. In correspondence with Hahn, petitioner also refers to his brother and the Clarks as his counsel. Moreover, the statement of sale executed upon the closing of petitioner's conveyance of the 100-acre parcel of land to Hahn and petitioner's receipt of the $825,000 downpayment, as well as the statement executed upon Hahn's satisfaction of the promissory note for the balance of the purchase price, both directed that a portion of these payments was to be distributed directly to petitioner's brother and the Clarks. These documents reveal that petitioner has held his family members out to the public as partners in his investments and has recognized their rights to distributions of the partnership's profits. Sec. 1.704-1(e)(2)(vi) and subdivisions (c) and (d), Income Tax Regs.

Respondent argues that little or no consulting advice was given to petitioner by his brother or the Clarks. Respondent notes that Dr. Elrod and the Clarks lack formal training and experience in business, finance, and real estate matters. However, the correspondence between petitioner and his family state petitioner's appreciation for his brother's and the Clarks' "counsel," "advice," and "valued aid." Petitioner has evidenced his good-faith intention to conduct his real estate activities as a partnership or joint venture with his brother and sister and we do not purport to substitute our own judgment with respect to the expertise or qualifications of petitioner's family members. See *Commissioner v. Culbertson*, 337 U.S. 733, 745 (1949). We also note that petitioner's payment of a total amount of $126,300, payable one-half to petitioner's sister and her husband and one-half to petitioner's brother, does not constitute an unreasonable sum, given that the total purchase price of the 100-acre and 29-acre parcels is in excess of $4 million.

We find for petitioner that the expenses deducted as consulting fees were incurred pursuant to a valid family partnership agreement and are properly deductible as such. Accordingly, we need not address respondent's argument

that these payments do not constitute deductible selling expenses.[13]

### Charitable Contribution Deduction

The next issue for decision is whether petitioner is entitled to a charitable contribution deduction for his 1979 transfer of land and grant of easements to the Commonwealth of Virginia, and if so, the amount of such deduction. Petitioner claimed a deduction in the amount of $1,047,609 as the purported fair market value of the property conveyed, plus an additional deduction in the amount of $3,500 for appraisal fees. Respondent argues first that both deductions should be denied in their entirety because the transfers do not constitute charitable contributions. Alternatively, respondent argues that even if petitioner is entitled to a charitable contribution deduction the fair market value of the property transferred is only $876,000. Respondent concedes on brief that under the alternative position, petitioner is entitled to deduct the full amount of the appraisal fees.

Section 170(a) allows a deduction for any charitable contribution, as defined in section 170(c).[14] The phrase "charitable contribution" as used in section 170 generally has been held to be synonymous with the term "gift." *Sutton v. Commissioner*, 57 T.C. 239, 242 (1971), and the cases cited therein. The charitable contribution deduction is not allowed where a taxpayer intends to obtain a "direct or indirect benefit in the form of enhancement in the value or utility of the taxpayer's remaining land or otherwise to benefit the taxpayer." *Sutton v. Commissioner, supra* at

---

[13]In the computations of the proper amount of petitioner's deficiencies under Rule 155, an adjustment must be made to eliminate the $126,300 deduction allowed as selling expenses in the notice of deficiency.

[14]Sec. 170 provides in relevant part as follows:

SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year.

* * * * * * *

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

243. The determination of a taxpayer's primary incentive, motive, or purpose is a question of fact. In this inquiry we do not simply look to the taxpayer's subjective attitude, but rather seek to expose the true nature of the transaction. *Sutton v. Commissioner, supra* at 243. Petitioner bears the burden of proving that the conveyances constitute charitable contributions or gifts. Rule 142(a); *Graham v. Commissioner*, 83 T.C. 575, 580 (1984), on appeal (9th Cir., Nov. 19, 1984).

Petitioner argues that the transfers constitute gratuitous conveyances made in large measure out of a desire to benefit the general public, and not because he was compelled or obligated to make the transfers. Petitioner further argues that any benefits that he may derive from such conveyances are incidental, purely inconsequential relative to the benefit that inures to the public, and at best only speculative. Petitioner maintains that as a result of his transfers and the relocation of certain roads on this property, access to remaining portions of his land has been impaired. He contends that this has reduced the marketability of his remaining property so that the transfers have been to his detriment.

We reject petitioner's argument that he transferred this property in order to benefit the general public. To the contrary, we find that the transfers were made in anticipation of petitioner's own personal gain. Petitioner conveyed a total of approximately 10.273 acres of land to the State, consisting of parcel A, approximately 10.191 acres, and parcel B, approximately 0.082 acres, and granted to the State easements over approximately 3.175 acres of his adjoining property. All of this land is located within petitioner's original 300-acre tract of land, of which approximately 100 acres were intended to be developed as a regional shopping center pursuant to the optional sales contract, as amended, as discussed in the option versus sale section above. Parcel A also is the site of certain proposed relocated roads and a proposed improved interchange off Interstate Route 95. Petitioner and Hahn, the developer of the proposed shopping center, believed that the relocated roads and improved interchange were necessary in order to provide adequate access to the shopping center site, and

petitioner realized that the shopping center would not be constructed without these road improvements.

At trial, Mrs. Alice Humphries (Humphries), who in 1979 served as chairperson of the Prince William County Board of Supervisors and as chairperson of its Dale City Interchange Committee, testified on behalf of respondent. She stated that as of 1979 the new interchange was needed, first, to alleviate the existing excessive traffic problem and, second, to encourage commercial development in the area around the interchange, including the construction of the proposed shopping center, in order to generate jobs and income in the county. However, despite Humphries' testimony that the primary reason for the construction of the relocated roads and improved interchange was to serve the public at large, we cannot ignore or diminish the importance of the new roadways to petitioner and their anticipated impact on the shopping center site.

Petitioner's expert's appraisal report describes parcel A as the site for the relocated I-95 interchange, known as the Dale City Interchange. The appraisal report also refers to the proposed interchange as "the new shopping center access road." At trial, petitioner testified to his understanding that Hahn would not develop the shopping center unless the interchange was improved because the existing site lacked proper ingress and egress. Moreover, Humphries admitted that the State would not permit the development of the shopping center without these improved roadways. This testimony reveals that the improved roadways were necessary to satisfy petitioner's long-held dream to develop this site as a regional shopping center. This clearly is an additional benefit to petitioner beyond the improved traffic conditions to be enjoyed by members of the public at large. See *Seed v. Commissioner*, 57 T.C. 265, 276 (1971); *Wolfe v. Commissioner*, 54 T.C. 1707, 1716 (1970).

Petitioner argues that the conveyances are gratuitous as he was not obligated under contract or otherwise compelled to make the transfers. He also relies on the fact that the shopping center site was zoned for commercial purposes prior to his transfers to the State. Petitioner mistakenly relies upon *Scheffres v. Commissioner*, T.C. Memo. 1969-41, in which the taxpayers were entitled to a charitable

contribution deduction for their transfer of land to the county board of education. In *Scheffres*, we actually found that there was no legally enforceable contract right to compel the taxpayers' conveyance, whereas in the instant case, we need not address that argument, given that the facts of the two cases clearly are distinguishable on other grounds. In *Scheffres*, there was no economic benefit to be derived by the taxpayers by their transfer of land, but rather there was a detriment, since that land would have been acquired by negotiated purchase price or by condemnation had it not been conveyed gratuitously.

Here, the Prince William County Board of Supervisors desired and, in fact, expected petitioner and the other area landowners to convey their property to the State to effectuate the proposed improved interchange project. Even if it might have been implied that their land otherwise might have been taken by eminent domain, the probability of this happening seems questionable. Humphries' testimony indicates that there was a shortage of government funding for this project and that any moneys used to purchase the properties apparently would have depleted the funding of the new interchange. Therefore, although the shopping center site was zoned for commercial purposes before petitioner's conveyances, and even if petitioner were not under any legal obligation or compulsion to convey the property to the State, absent the conveyances as the site of the improved interchange petitioner would not have been able to realize the use of the 100-acre site as a shopping center.

We also reject petitioner's arguments that any benefit that he might derive from the conveyances are "incidental," "inconsequential" relative to the public benefit, and "only speculative," and that, in fact, the conveyances were to his detriment. Petitioner's arguments are based on the fact that even as of the date of trial the proposed interchange was not yet fully completed and the shopping center was not yet built. Petitioner also notes that the property was conveyed irrevocably to the State, whether or not the shopping center site ever would be developed as such. However, the determination of whether petitioner made a charitable contribution must be based on whether he anticipated a

benefit as of the time of the transfer. *Pettit v. Commissioner*, 61 T.C. 634, 642 (1974).

As discussed in the option versus sale section above, in 1977, petitioner sold a total of approximately 129 acres of land adjacent to that property conveyed to the State, for a total purchase price of more than $4 million. As of the date of petitioner's conveyances to the State, he had received only the $825,000 downpayment plus monthly interest payments on the promissory notes for the previous 2 years. Petitioner had yet to receive the remaining monthly payments, as well as the principal amount of the notes payable on the earlier of 3 years from the execution date of the notes or upon the commencement of construction of the shopping center. Clearly petitioner expected to derive a direct and substantial benefit from the construction of the improved interchange, which could not be constructed absent petitioner's conveyances to the State. Petitioner also asserts that certain remaining portions of his land, and in particular, a parcel of land consisting of approximately 5.2 acres, were rendered unmarketable due to impaired access as a result of the conveyances. Even assuming arguendo a negative impact upon this 5.2-acre parcel of land, respondent correctly points out that such detriment is not significant in comparison to the potential increase in value of petitioner's remaining property, consisting of approximately 155 acres (300 acres less (100 + 29 + 10.273 + 5.2) acres), as a result of the improved interchange. See *Foster v. Commissioner*, 80 T.C. 34, 224 (1983), affd. with respect to this issue 756 F.2d 1430, 1438 (9th Cir. 1985); *Conforte v. Commissioner*, 74 T.C. 1160, 1199-1200 (1980), affd., revd. and remanded in part on other issues 692 F.2d 587 (9th Cir. 1982); *Wolfe v. Commissioner*, supra at 1715.[15] We conclude that petitioner's conveyance of the land located in parcel A does not constitute a charitable contribution.

We do find, however, that petitioner's conveyances of the land located in parcel B, as well as the easements granted over petitioner's adjacent property, were made primarily for public-spirited and altruistic purposes. Petitioner and his

_____
[15]See also *Ottawa Silica Co. v. United States*, an unreported case (Ct. Cl. Trial Div. 1982, 49 AFTR 2d 82-1162, 82-1 USTC par. 9308), affd. per curiam 699 F.2d 1124 (Fed. Cir. 1983); *Taynton v. United States*, an unreported case (E.D. Va. 1960, 5 AFTR 2d 1466, 1468, 60-1 USTC par. 9458, at 76,283).

brother, Dr. Elrod, had discussed the need for better access to the nearby Potomac Hospital. Although parcel B apparently does not extend up to the hospital property, itself, this land and the easements were conveyed to the State as part of the property needed to provide a more direct access route to the hospital.

Petitioner is entitled to a charitable contribution deduction only with respect to his conveyance of parcel B and his grant of easements. Respondent does not contest petitioner's expert appraiser's values of parcel B, consisting of less than 1 acre of land, assigned a "nuisance value" of only $1,000, and of the easements, valued at $50,000. Accordingly, we conclude that petitioner is entitled to a charitable contribution deduction in the amount of $51,000.[16]

## Special Allocation of Partnership Losses

The final issue for decision is whether petitioner is entitled to a special allocation of 25 percent of partnership losses with respect to his partnership interest in EWH. In the notice of deficiency, respondent determined deficiencies in petitioner's Federal income taxes for the 1977 through 1980 taxable years based on the disallowance of the special allocation for lack of substantial economic effect. Respondent argues that petitioner's distributive share of partnership loss is limited to 5 percent, consistent with petitioner's capital interest in the partnership and distributive share of profits. Respondent also has determined that, in any event, the total amount of losses deductible by petitioner is limited to his $132,500 basis in the partnership. Petitioner argues that the special allocation set forth in the partnership agreement should be respected for Federal income tax purposes and disagrees with respondent's determination of his partnership basis. Petitioner bears the burden of proving that respondent's determinations in the notice of deficiency are incorrect. Rule 142(a); *Ogden v. Commissioner*, 84 T.C. 871, 884 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986).

---

[16]Based on respondent's concession, petitioner is entitled to an additional deduction for appraisal fees incurred with respect to the allowable charitable contribution. Therefore, we will permit a reasonable amount of such deduction, as attributable to the qualifying conveyances only, to be included in the computations under Rule 155.

The relevant facts with respect to the formation of EWH are summarized here. On April 25, 1977, petitioner, as seller, and Hahn, as purchaser, executed an optional sales contract for the conveyance of approximately 100 acres of petitioner's land, located on a 300-acre tract of property, to be developed as a regional shopping center. The contract was amended on August 19, 1977, and new provisions were added whereby Hahn agreed to purchase an additional 29-acre parcel of land also located on the 300-acre tract. The total purchase price for the 129 acres equaled $4,347,568.40, consisting of an initial downpayment in the amount of $825,000 plus two nonrecourse promissory notes. The notes, issued with respect to the 100-acre and 29-acre parcels, were executed by EWH and Hahn in the amounts of $2.5 million and $1,022,568.40, respectively.

Pursuant to the terms of the optional sales contract, as amended, petitioner and Hahn formed a limited partnership known as EWH. Petitioner held a 5-percent capital interest as its limited partner, and Hahn held the remaining 95-percent capital interest as its general partner. Petitioner and Hahn each conveyed their respective interests in the 100-acre parcel of land to the partnership. Petitioner conveyed the 29-acre parcel directly to Hahn, and this did not become a partnership asset.

a. *Petitioner's Basis in the Partnership*

Petitioner's distributive share of partnership loss is deductible to the extent of his basis in the partnership. Sec. 704(d). Therefore, before we discuss whether the special allocation of partnership loss may be respected, we first must determine petitioner's basis in the partnership, based upon the adjusted basis of property deemed contributed by petitioner to the partnership. Sec. 722.

Petitioner and Hahn have agreed that the purchase price of the 100-acre parcel constitutes only 95 percent of its fair market value. The remaining 5-percent value, $175,000, was deemed to be a contribution of capital by petitioner to the partnership and was so reflected in petitioner's partnership capital account. As of the formation of EWH, petitioner's adjusted basis in this 5-percent interest in the land equaled $7,500.

Petitioner's basis in the partnership also must be increased by his share in certain partnership liabilities. Sec. 752. In 1977, EWH executed a promissory note in the amount of $1.8 million to the Virginia National Bank for the development of the shopping center site. At trial, petitioner conceded that, because Hahn was personally liable for the satisfaction of this note, as a limited partner petitioner is not entitled to any increase in his partnership basis with respect to this partnership debt. Sec. 752; sec. 1.752-1(e), Income Tax Regs.

EWH also executed a promissory note in the amount of $2.5 million to petitioner with respect to the purchase of the 100-acre parcel. We note that petitioner contends that he also is not entitled to any increase in his partnership basis with respect to this note, on the belief that the note does not constitute a fixed and unconditional obligation of EWH. We disagree, based upon the reasons set forth in the option versus sale section, and restate that this note constitutes a valid debt issued pursuant to the completed sale of petitioner's land. Therefore, as a limited partner, petitioner is entitled to share in this nonrecourse liability in the same proportion as he shares in partnership profits, that is, 5 percent. Sec. 752; sec. 1.752-1(e), Income Tax Regs.

We conclude that, as of 1977, petitioner's total basis in the partnership equaled $132,500, that is, $7,500 for the land deemed contributed plus $125,000 (5% × $2,500,000) for the nonrecourse partnership debt, as respondent has determined in the notice of deficiency. Secs. 722, 752(a); sec. 1.722-1, Income Tax Regs. Petitioner did not make any additional capital or cash contributions to the partnership and he does not present any other arguments to increase his partnership basis for any of the taxable years in issue. Therefore, under section 704(d), the total amount of partnership losses deductible by petitioner for all of the taxable years in issue cannot exceed $132,500.

b. *Special Allocation*

The partnership agreement provides that petitioner's distributive shares of partnership profits and losses are 5 percent and 25 percent, respectively. Section 4.3 of the partnership agreement provides that the special allocation was made "in consideration of Elrod having made the land

available to the Partnership at extremely costly damage to the residue of the Elrod property." For example, petitioner incurred an obligation to contribute, at his own cost, 700,000 cubic yards of dirt to the shopping center site from his remaining property located on the original 300-acre tract, which also impaired the marketability of his remaining property.

In general, a partner's distributive share of income, gain, loss, deduction, or credit shall be determined by the terms of the partnership agreement. Sec. 704(a). However, this general rule is limited by the provisions of section 704(b), as follows:

SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(b) DETERMINATION OF DISTRIBUTIVE SHARE.—A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if—

\* \* \* \* \* \* \*

(2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

In determining whether the special allocation is to be respected, the sole test for all of the taxable years in issue here is whether the special allocation has "substantial economic effect."[17]

Respondent argues that the special allocation to petitioner lacks substantial economic effect. Petitioner argues that the special allocation satisfies the test for substantial economic effect, as interpreted by *Miller v. Commissioner*, a Memorandum Opinion of this Court, which states as follows:

[1] If a partner's allocation of an item of income or deduction is reflected in his capital account and [2] if the liquidation proceeds of the partnership are distributed in accordance with the capital account balances, the allocation has substantial economic effect. [T.C. Memo. 1984-336, 48 T.C.M. 409, 411, 53 P-H Memo T.C. par. 84,336, at 1304-84. Citations and fn. ref. omitted.]

---

[17]Sec. 704 was amended by sec. 213(d), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1548. Sec. 704(b), as amended, replaced the tax-avoidance or tax-evasion test with the "substantial economic effect" test, effective for taxable years beginning after Dec. 31, 1975.

In *Miller*, the special allocation was not respected partly because the partnership agreement provided that liquidation proceeds were to be distributed in accordance with the partners' ownership interests rather than their capital account balances. There was no further discussion with respect to any additional elements of the substantial economic effect test. However, even where these first two requirements are met, there is a third requirement, which provides that where a partner's capital account registers a deficit attributable to a special allocation, that partner must have the obligation upon liquidation to restore such deficit. *Ogden v. Commissioner*, 84 T.C. 871, 884 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986); *Goldfine v. Commissioner*, 80 T.C. 843, 852 (1983).[18]

The parties do not dispute that the first two requirements of the substantial economic effect test are met.[19] Sections 3.5 and 11.2 - 11.5 of the EWH partnership agreement provide for the maintenance of partners' capital accounts and for liquidation proceeds to be distributed in accordance with the capital accounts. However, there is no express provision in the agreement that establishes an obligation upon liquidation for petitioner to restore any deficit in his capital account balance. The so-called "capital accounts" analysis examines whether the partner to whom a special allocation is made for tax purposes also bears the economic burdens and benefits of the special allocation. *Allison v. United States*, 701 F.2d 933, 938 (Fed. Cir. 1983); *Hamilton v. United States*, 231 Ct. Cl. 517, 532-533, 687 F.2d 408, 417-418 (1982); *Goldfine v. Commissioner, supra* at 851. Absent such an obligation to restore a deficit in a capital account attributable to a special allocation, the other partner or partners would bear part of an economic burden resulting from such special allocation. *Ogden v. Commissioner*, 84 T.C. at 884-885.

The General Explanation of the Tax Reform Act of 1976 prepared by the Staff of the Joint Committee on Taxation explains the meaning of "substantial economic effect" as "whether the allocation may actually affect the dollar

---

[18]See also *Hirsch v. Commissioner*, T.C. Memo. 1984-52.

[19]There also is no dispute with respect to whether the economic effect of the special allocation here is "substantial."

amount of the partners' share of the total partnership income or loss, independent of tax consequences."[20] The explanation continues, in a footnote, that—

The determination of whether an allocation may actually affect the dollar amount of the partners' shares of total partnership income or loss, independent of tax consequences, will to a substantial extent involve an examination of how these allocations are treated in the partners' capital accounts for financial (as opposed to tax) accounting purposes; this assumes that these accounts actually reflect the dollar amounts that the partners would have the rights to receive upon the liquidation of the partnership. [Staff of Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 95 & n. 6 (1976), 1976-3 C.B. (Vol. 2) 1, 107.]

Respondent has determined deficiencies in petitioner's Federal income taxes for the 1977 through 1980 taxable years. In 1977 and 1978, petitioner maintained positive capital account balances, and in 1979 and 1980, petitioner's capital accounts registered deficits. The absence of express language in the partnership agreement of an obligation upon liquidation to restore a deficit in a partner's capital account is not necessarily fatal to the validity of a special allocation. *Frink v. Commissioner*, T.C. Memo. 1984-669, affd. with respect to the allocation of partnership losses and revd. and remanded on another issue 798 F.2d 106 (4th Cir. 1986).[21]

As of the end of each of the 2 years in which petitioner maintained positive capital account balances, no other partners could bear more than their share of any economic burden or benefit attributable to the special allocation to petitioner. Therefore, with respect to the 1977 and 1978 taxable years, the special allocation does not lack substantial economic effect. However, to the extent that the special allocation creates a deficit in petitioner's capital account in the 1979 and 1980 taxable years, the absence of the

---

[20]For example, the question of whether there is substantial economic effect to a special allocation aside from its tax consequences has been examined in the context of a "gain charge back" provision in a partnership agreement. That determination is based upon whether a partner who had received a special allocation of loss, for example, depreciation, with respect to certain property would bear the economic burden of the special allocation in the event that the partnership were liquidated and that property were disposed of at a loss. *Ogden v. Commissioner*, 84 T.C. 871, 886-887 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986). See *Orrisch v. Commissioner*, 55 T.C. 395, 403-404 (1970), affd. per curiam in an unreported opinion (9th Cir. 1973, 31 AFTR 2d 73-1069); *Magaziner v. Commissioner*, T.C. Memo. 1978-205.

[21]See also *Dibble v. Commissioner*, T.C. Memo. 1984-589.

obligation upon liquidation to restore such deficit is fatal here.[22] In these years, the other partners in the partnership could have borne more than their share of any economic burden attributable to the special allocation if the partnership had liquidated as of the end of either year. Therefore, the special allocation lacks economic effect in 1979 and 1980 to the extent that it creates a deficit in petitioner's capital account balance in each of these years.

Accordingly, we conclude that for the 2 years in which petitioner maintained positive capital account balances, 1977 and 1978, the special allocation to petitioner is to be respected. However, for the 2 years in which petitioner's capital account balances registered deficits, 1979 and 1980, the special allocation lacks economic effect and is not to be respected to the extent that any deficit in each year is attributable to the special allocation.[23]

*Decision will be entered under Rule 155.*

[22]Petitioner apparently concedes that although the partnership agreement requires liquidation proceeds to be distributed in accordance with the Virginia Uniform Limited Partnership Act, this provision does not establish the requisite obligation upon liquidation for petitioner to restore any deficit capital account balance. See also *Goldfine v. Commissioner*, 80 T.C. 843, 853 (1983).

[23]It is unclear, however, whether this same result would be reached under the final regulations promulgated under sec. 704(b). The final regulations were filed on Dec. 24, 1985, and published on Dec. 31, 1985. T.D. 8065, 50 Fed. Reg. 53420 (1985), 1986-5 I.R.B. 5. They are effective generally for partnership taxable years beginning after Dec. 31, 1975. However, for partnership taxable years beginning after Dec. 31, 1975, but before May 1, 1986 (or before Jan. 1, 1987, with respect to special allocations of nonrecourse debts), a special allocation that does not satisfy their requirements nonetheless will be respected for purposes of the final regulations if such allocation has substantial economic effect as interpreted under the relevant case law and the legislative history of the Tax Reform Act of 1976, and the provisions of this paragraph in effect for partnership taxable years beginning before May 1, 1986. Sec. 1.704-1(b)(1)(ii), Income Tax Regs.

Under the final regulations, the determination of substantial economic effect is set forth as an annual test. Sec. 1.704-1(b)(2)(i), Income Tax Regs. However, they also provide that the obligation to restore a deficit capital account balance attributable to a special allocation must be provided for in the partnership agreement "throughout the full term of the partnership" (sec. 1.704-1(b)(2)(ii)(*b*), Income Tax Regs.), unless the allocation otherwise is deemed to have economic effect. See sec. 1.704-1(b)(2)(ii)(*c*), (*d*), and (*i*), Income Tax Regs.

Moreover, the final regulations were amended as of Sept. 9, 1986, T.D. 8099, 51 Fed. Reg. 32061 (1986), 1986-39 I.R.B. 5, just prior to publication of this opinion. As amended, the final regulations would apply a hypothetical liquidation test as of the end of each partnership taxable year. However, a special allocation would be deemed to have economic effect in any given year provided that in the event of a liquidation of the partnership as of the end of the taxable year in issue or any future partnership taxable year the same economic results would be produced "regardless of the economic performance of the partnership." Sec. 1.704-1(b)(2)(ii)(*i*), Income Tax Regs.