ROBERT A. GOODMAN AND BARBARA J. GOODMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goodman v. Commissioner
Docket No. 11030-85
United States Tax Court
T.C. Memo 1990-114; 1990 Tax Ct. Memo LEXIS 114; 59 T.C.M. (CCH) 34; T.C.M. (RIA) 90114; March 7, 1990
Jay I. Bartz, for the petitioners. Terence D. Woolston and Mark S. Pendery (on brief only), for the respondent. PARKER
*148 MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions Under
Year
Deficiencies
Sec. 6653(a)
1974
$  5,803.00
--
1975
8,077.00
--
1976
10,597.00
--
1977
13,731.00
--
1978
14,528.00
--
1979 (wife) *
5,229.47
$ 243.80
1979 (husband) *
4,522.47
243.80
Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years pertinent to this case, and all Rule references are to the Tax Court Rules of Practice and Procedure. The principal issue before the Court is whether petitioner Robert A. Goodman made any capital contribution *116 to and had any basis in the so-called Area Four Partnership. If so, the issue becomes whether the allocation of profit and loss of the Area Four Partnership to petitioner Robert A. Goodman (90 percent of losses and 10 percent of gain) had "substantial economic effect" under section 704(b)(2) and section 1.704-1(b)(2), Income Tax Regs. The remaining issue is whether petitioners are liable for the negligence addition under section 6653(a) for the year 1979. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplement to stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed in this case petitioners were residents of the State of Arizona. About 1960 petitioner Robert A. Goodman (hereinafter petitioner) established the Hi-Way Electric Company of Illinois, an Illinois corporation (hereinafter Hi-Way of Illinois). Petitioner was, and at all relevant times continued to be, the principal stockholder of Hi-Way of Illinois, although a few long-time employees later acquired some of the stock. Hi-Way of Illinois was engaged in the electrical *117 contracting business in the Midwest, with offices in Chicago and Skokie, Illinois. Hi-Way of Illinois was a very successful business. In 1974 petitioner visited Arizona and decided to go into the cotton farming business there. In 1975 petitioner organized a corporation, Hi-Way Electric of Arizona (hereinafter Hi-Way of Arizona), to conduct the farming operation in Arizona. Hi-Way of Arizona was a wholly owned subsidiary of Hi-Way of Illinois. Hi-Way of Illinois ultimately contributed assets and funds of about $ 1,000,000 to Hi-Way of Arizona for the farming operation in Arizona. The development of the farm and some farming operations began in 1975. Petitioner decided to close down the operations of Hi-Way of Illinois and devote himself entirely to the farming operation in Arizona. The record does not indicate exactly when the Illinois corporation ceased operations; it is now a dormant corporation, but still owns all of the stock of Hi-Way of Arizona. In any event, in 1975 Hi-Way of Arizona purchased about 960 acres of land in fee simple in the Harquahala Valley area of Arizona, and at all times pertinent to this case the land was owned by and held in the name of Hi-Way of *118 Arizona. In addition to the land it purchased, Hi-Way of Arizona also leased lands, some 1,650 acres, from the State of Arizona for use in the cotton farming operation. At all times pertinent to this case, Hi-Way of Arizona owned a leasehold interest in these lands and held those lands in its name. Both the purchased and leased lands were essentially desert land that had to be developed into farm land by clearing and building irrigation facilities and by other reclamation activities. The initial development from desert to farm land was done by Hi-Way of Arizona, and that endeavor largely exhausted its capital (the $ 1,000,000). Because of the heavy expense of developing these lands for farming, petitioner decided to obtain outside financing. In 1975 petitioner created a partnership, B. J. Ranch, to obtain additional financing and to conduct the farming operation. The general partner of B. J. Ranch was Hi-Way of Arizona, a corporation essentially owned and controlled by petitioner. The first limited partner was petitioner's lawyer in Chicago who wanted to invest in the farm. The others who became limited partners of B. J. Ranch were various business friends and acquaintances *119 of petitioner. Petitioner himself was not a partner of B. J. Ranch. He was involved in the partnership and in the farming operation only through his ownership and control of Hi-Way of Illinois and Hi-Way of Arizona. Hi-Way of Arizona contributed its investment in land and land improvements to the B. J. Ranch Partnership, and the limited partners contributed cash, $ 137,000 from the first investor and later an additional $ 200,000 from six other investors. From 1975 through 1977, Hi-Way of Arizona and B. J. Ranch continued to develop land and began to grow cotton. The farm was laid out in four areas or sections (not legal descriptions but petitioner's own designation of the areas by the order of their development). The first three areas had been developed by 1977. The development work included digging eight deep water wells, building ditches to transport the irrigation *149 water, building roads, leveling land, and preparing the soil for farming. Cotton crops were planted in 1977 and 1978, but in both years the so-called "100 year" floods damaged the land and virtually destroyed the cotton crops. Also in 1978 and 1979 the costs of farming were going "sky high" because of *120 the very high interest rates (20 to 22 percent) in that period. More money was needed to repair the flood damage to the land and to develop Area Four, the last undeveloped portion of the farm. Area Four included some 600 acres of land leased by Hi-Way of Arizona from the State of Arizona, the legal description of which was "Section 2, Township 2N, Range 11W." The soil in Area Four was unstable, and after some development work Area Four was planted in millet in order to stabilize the soil, rather than to make money. By 1979 the development work had been completed in Area Four and a cotton crop was planted that year. Before that time, however, Hi-Way of Arizona and B. J. Ranch had completely exhausted any remaining partnership funds. The limited partners of B. J. Ranch declined to invest any more money in the farm project. Petitioner nonetheless decided to continue to develop Area Four. As a result of this decision, petitioner in 1977 purported to form the Area Four Partnership in which he was to be the sole limited partner and his essentially controlled corporation, Hi-Way of Arizona, was to be the sole general partner. The purported capital contributions to, and income and *121 loss of, this Area Four Partnership give rise to the issues in this case. The Certificate of Limited Partnership for the Area Four Partnership (hereinafter Certificate) was executed "as of" January 1, 1977, but was not recorded with the State of Arizona until January 11, 1978. The record does not establish that any partnership agreement was ever drawn up or executed. The Certificate was signed by Robert A. Goodman, President, for the general partner, Hi-Way of Arizona, and signed by Robert A. Goodman as the limited partner. The Certificate recited that the principal business of the partnership was to conduct farming operations and to purchase, own, lease, manage, improve, operate and sell partnership property. Paragraph 5 of the Certificate recited that the name, place of residence, contribution to capital by, and percentage of ownership of, the limited partner were as described below. While petitioner's name and address were listed, the contribution to capital and percentage of ownership columns were left blank. Paragraphs 6, 7 and 9 of the Certificate read as follows: 6. The general partner has contributed land, property, and money to the partnership and owns a percent *122 interest in the partnership. 7. The liability of the limited partner is limited to the amount of his investment in the partnership. * * * 9. The profits and losses of the partnership are to be divided among the General and Limited Partner as their interests appear, supra. The interests of the general and limited partner, however, do not "appear, supra." Other provisions were that the limited partner was not required to make additional contributions to the partnership "at any time," that the limited partner's contribution was to be returned, if available for distribution, at the time of liquidation of the partnership, that the partnership was to exist from January 1, 1977 through January 1, 1979, and that no additional partners (general or limited) could be admitted although the limited partner had a right "to substitute an assignee as contributor in his place." Nowhere in the Certificate was there any information as to the amount of either partner's contribution to capital or percentage of interest in the profits and losses of the partnership. Exhibit A to the Certificate listed as the general partner's contribution to the Area Four Partnership "Section 4, Township *123 2 North, Range 11 West, Gila and Salt River Base and Meridian." That legal description is in error and the correct legal description of the land purportedly contributed to the Area Four Partnership is "Section 2 * * *." [1] The land that Hi-Way of Arizona purportedly contributed to the Area Four Partnership was certain property leased by the State of Arizona to Hi-Way of Arizona. This leased land was also the area of the farm petitioner had designated as "Area Four." This leased land had already been assigned by Hi-Way of Arizona to the B. J. Ranch. Exhibit B to the Certificate read as follows: Exhibit B Property (Personal) and Cash Contributed by The General Partner and Cash Contributed by The Limited Partner to Section Four Partnership General Partner: Exhibit B was left blank as to any contribution by either the general or the limited partner. There is no documentary evidence in the record to establish what, if anything, petitioner as the *150 limited partner contributed to the Area Four Partnership in 1977. *124 On April 25, 1978, there was recorded with the State of Arizona an Amended Certificate of Limited Partnership (hereinafter Amended Certificate) for the Area Four Partnership. Paragraph 6 of the Amended Certificate listed petitioner's contribution to capital as $ 100,000 and his percentage of ownership as 33 percent. Paragraph 7 of the Amended Certificate recited that the general partner had contributed land, property, and money to the partnership and owned a 66-percent interest in the partnership. The remaining one percent interest was not accounted for. The limited partner's liability was still "limited to the amount of his investment in the partnership," the term of the partnership was still January 1, 1977 through January 1, 1979, unless sooner terminated, the limited partner was not required to make any additional contributions to the partnership "at any time," the limited partner's contribution was to be returned, if available for distribution, at the time of liquidation, no additional partners (general or limited) could be admitted, but the limited partner had the right to substitute an assignee as contributor in his place. Two principal changes were made in the Amended *125 Certificate recorded in April of 1978. Paragraph 10 provided that: The profits and losses of the partnership are to be allocated between the general and limited partner as follows: General Partner
Limited Partner
90% of Profits,
10% of Profits,
10% of Losses
90% of Losses
Exhibit A to the Amended Certificate remained the same, i.e., with the same erroneous reference to "Section 4 * * *," but Exhibit B had been filled in as follows: Property (personal) and Cash Contributed by the General Partner and Cash Contributed by the Limited Partner to Section Four Partnership General Partner:
$ 200,000.00
Limited Partner:
$ 100,000.00
The Area Four Partnership did not terminate on January 1, 1979, as provided in the Certificate and Amended Certificate, described above, but purportedly terminated by a Dissolution Agreement entered into "as of December 31, 1979." That Dissolution Agreement between Hi-Way of Arizona, general partner, and petitioner, limited partner, listed in paragraph 1 the Area Four Partnership assets as follows: a. Real property described as Section 4 [sic], Township 2 North, Range 11 West, G&SRB&M, including improvements *126 consisting of wells and land preparation for farming. b. Receivables from B. J. Ranch in the Amount of $ 57,334.00, as described above. c. Note dated January 1, 1977 from the Limited Partner to the Partnership (the Goodman Note). d. Note dated May 10, 1977 from the General Partner to the Limited Partner (the Hi-Way Note), which note was assigned to the Partnership by assignment dated May 10, 1977. Paragraph 5 provided that all real property and improvements, plus 90 percent of all profits, would be distributed to Hi-Way of Arizona and that the Goodman Note, marked cancelled, the Hi-Way Note reassigned to petitioner, and 10 percent of all profits would be distributed to petitioner. Paragraph 6 of the Dissolution Agreement further provided: 6. Personal Guaranty. It is understood and acknowledged that, as a result of the distribution to the Limited Partner of the Goodman Note and the Hi-Way Note, the Partnership will or may lack sufficient assets, including accounts receivable, to permit the distribution to the Partners of sufficient money and other assets to satisfy the Partnership's obligation to distribute profits as set forth above. Accordingly, and in consideration *127 for the immediate distribution to the Limited Partner of the above described notes, the Limited Partner hereby agrees to guarantee payment to the General Partner of the General Partner's share of Partnership profits. It is further agreed that the Limited Partner's obligation of personal guaranty as created by this paragraph will be satisfied by the execution and delivery, within 10 days after the completion of the account as set forth in paragraph 4 and upon demand by the General Partner, of the Limited Partner's promissory note, payable one year from the date with interest at the rate of 8% per annum. The record does not establish whether or not the above Dissolution Agreement was ever executed. The record is unclear as to the disposition of these various notes which purportedly were part of petitioner's contribution to the capital of the Area Four Partnership. At various times during the audit petitioner gave different explanations as to what he contributed as capital to the Area Four Partnership. One explanation was that petitioner contributed to the Area Four Partnership his own personal note as indicated by the Dissolution Agreement (the Goodman Note dated January 1, 1977) *128 for $ 60,000 and cash in the amount of $ 40,000. There is no evidence in the record of any cash contribution. There is in the record no *151 copy of, and no other probative evidence of the existence of, a Goodman Note dated January 1, 1977, for an amount of $ 60,000. Another explanation put forth by petitioner was that he contributed to the Area Four Partnership his own promissory note in the amount of $ 60,000 and a promissory note in the amount of $ 40,000 from Hi-Way of Arizona to petitioner. As noted, no copy of, or other probative evidence of the existence of, a $ 60,000 Goodman Note has been produced. There are in evidence two promissory notes due May 10, 1977, to petitioner from Hi-Way of Arizona, each in the amount of $ 20,000, one dated August 1, 1976, and the other dated September 1, 1976. There is also in evidence an unexecuted assignment, purportedly by petitioner as assignor, which purports to assign to the Area Four Partnership that "certain promissory note dated May 10, 1977 in the amount of $ 40,000.00." The $ 40,000 promissory note dated May 10, 1977, was due from Hi-Way of Arizona to petitioner on August 10, 1977. There is no evidence that that note *129 was ever paid. Another explanation put forth by petitioner before trial was that he contributed to the Area Four Partnership the $ 40,000 Hi-Way of Arizona promissory note, the $ 20,000 Hi-Way of Arizona promissory note dated August 1, 1976, and the $ 20,000 Hi-Way of Arizona promissory note dated September 1, 1976. However, it appears that the $ 40,000 Hi-Way of Arizona note dated May 10, 1977, superseded the two earlier Hi-Way of Arizona notes executed in 1976. There is no evidence that any of these purported notes was ever paid. At trial petitioner offered yet another version of his capital contribution to the Area Four Partnership. Petitioner testified that he had cash that he wanted to contribute to the Area Four Partnership, that he gave the cash to Hi-Way of Arizona, and that Hi-Way of Arizona in turn gave him a promissory note which he in turn contributed to the Area Four Partnership. Petitioner could not explain why he took this convoluted route if he in fact had cash that he wanted to contribute to the Area Four Partnership. The Court did not believe his testimony. Petitioner did not have any cash at that time. At best he was referring to cash that he and/or Hi-Way *130 of Arizona hoped to obtain from certain disaster relief loans from the Farmers Home Administration of the United States Department of Agriculture (hereinafter FHA-USDA). On August 4, 1978, Barbara Jean Goodman, as Secretary of Hi-Way of Arizona issued a Certificate of Resolution adopted by the corporation's board of directors on March 31, 1978, that read as follows: RESOLVED, that since it has been determined to be in the best interest of the corporation for Robert A. Goodman and Barbara Jean Goodman to make application for a disaster relief loan of $ 200,000.00 to the U.S. Government Farmer's Home Administration, said proceeds to be applied toward reduction of corporate debt. Robert A. Goodman and Barbara Jean Goodman are hereby authorized to execute such documents as may be required to effectuate the closing of said loan. [Emphasis added.] On August 25, 1978, petitioner and his wife signed a promissory note to FHA-USDA for $ 200,000, wherein petitioner was listed as borrower. Also on August 25, 1978, petitioner, his wife, and Hi-Way of Arizona signed a Real Estate Deed of Trust for Arizona as borrowers to secure the $ 200,000 owing to the United States on that *131 FHA-USDA loan. Petitioner and his wife signed that deed as president and secretary, respectively, of Hi-Way of Arizona, and as "trustors." That Real *152 Estate Deed of Trust for Arizona included all real estate in Maricopa and Yuma Counties, either owned or leased by Hi-Way of Arizona, including the portion of the farm designated by petitioner as Area Four. FHA-USDA also required a title insurance policy insuring it for $ 200,000. That title insurance policy covered Maricopa County Parcels 1, 2 and 3, held in fee simple by Hi-Way of Arizona and Parcel 4, as to which Hi-Way of Arizona had a leasehold interest. It is not clear whether or not the land in Yuma County was also covered. Again, on December 7, 1978, Barbara Jean Goodman, as Secretary of Hi-Way of Arizona, issued a Certificate of Resolution adopted by the board of directors of the corporation at a meeting on December 1, 1978, that provided as follows: RESOLVED, that since it has been determined to be in the best interest of the corporation for Robert A. Goodman and Barbara Jean Goodman to make application for a disaster relief loan of $ 350,000.00 to the U.S. Government Farmer's Home Administration, said *132 proceeds to be applied toward reduction of corporate debt. Robert A. Goodman and Barbara Jean Goodman are hereby authorized to execute such documents as may be required to effectuate the closing of said loan. [Emphasis added.] And on February 7 and February 13, 1979, petitioner and his wife, personally, and, as president and secretary, respectively, of Hi-Way of Arizona signed promissory notes to FHA-USDA for the amounts of $ 300,000 and $ 50,000, respectively, for further FHA-USDA loans. In this instance, the Real Estate Deed of Trust, dated February 7, 1979, covering the two loans totaling $ 350,000, listed only Hi-Way of Arizona as the borrower and "trustor." Again the Real Estate Deed of Trust covered all of the real estate in Maricopa and Yuma Counties either owned or leased by Hi-Way of Arizona, including the Area Four leasehold interest. FHA-USDA again required a policy of title insurance for $ 350,000 for the Maricopa County lands held in fee simple by Hi-Way of Arizona and for the lands as to which the corporation had a leasehold interest. Again it is not clear whether or not the Yuma County lands (fee and leasehold interests) were covered. The FHA-USDA loans *133 were either illegal or at least petitioner and Hi-Way of Arizona were ineligible for them. Under the FHA-USDA regulations, such loans could not be made to a corporation or to a partnership in which a corporation was a controlling partner since the FHA-USDA did not consider a corporation to be a farmer. Also, petitioner in his individual capacity was not a farmer or engaged in farming. The FHA-USDA checks were deposited into the B. J. Ranch bank account. When the B. J. Ranch filed in bankruptcy in 1986 (Chapter 11), the entire $ 550,000 principal amount of the FHA-USDA loans was listed as one of its debts, jointly and severally with Hi-Way of Arizona and petitioner. B. J. Ranch also listed as one of its assets a leasehold interest in Area Four, i.e., the same leasehold that petitioner claims to have been assigned to the Area Four Partnership. When petitioner filed in bankruptcy in 1986 (Chapter 7), he too listed the entire principal amount of the FHA-USDA loans as one of his debts, jointly and severally with Hi-Way of Arizona and B. J. Ranch. Attached to the financial statement of the B. J. Ranch Partnership for the year ending December 31, 1978, were schedules of 1979 partnership *134 obligations and 1978 operating debts to be paid from the FHA-USDA loan proceeds. Those schedules were signed by petitioner and recited that the FHA-USDA funds were "disbursed in 1979 for crop expenses for the year 1978 for the B. J. Ranch." On the unaudited balance sheet for B. J. Ranch for December 31, 1978, there was shown as a long-term liability amounts of $ 350,000 and $ 241,347 owed to petitioner; however, petitioner's own personal financial statement for that period did not include any loans owing to FHA-USDA nor any amounts owed to him by B. J. Ranch. His principal asset was listed as his stock holdings in Hi-Way in the amount of $ 1,014,000. The Area Four Partnership did not have a bank account. The Area Four Partnership had no assets or books and records. The Area Four Partnership was purportedly terminated at the end of 1979, and Area Four was purportedly "returned" to the B. J. Ranch at that time. In connection with the Area Four Partnership, petitioners claimed losses of $ 100,000 and $ 148,435 on their 1977 and 1978 joint Federal income tax returns, respectively, and reported income of $ 13,847 on their 1979 return. The amounts of those claimed losses and income *135 have not been substantiated. The purported losses for 1977 and 1978 were carried back to 1974, 1975, and 1976 and carried forward to 1979. Petitioners were divorced on December 27, 1979, but filed a return for 1979 claiming the status of "Married filing joint return." By statutory notices of deficiency dated January 25, 1985, respondent disallowed these partnership loss deductions, carrybacks and carryover, eliminated the reported partnership income, and made another minor adjustment. [2] Respondent also determined that petitioners' filing status for 1979 was single rather than married filing jointly, and determined an addition to tax under section 6653(a) as to each taxpayer. ULTIMATE FINDINGS OF FACT 1. Petitioner Robert A. Goodman made no capital contribution to, and had no basis in, the Area Four Partnership. 2. The Area Four Partnership was a sham and had no economic substance. 3. Petitioners were negligent in *136 claiming the Area Four Partnership loss carryover and joint filing status in 1979. OPINION Petitioner seeks to deduct partnership losses that he claims to have incurred in 1977 and 1978 from the Area Four Partnership.[3]Section 704(d) provides that a partner's distributive share of partnership loss shall be allowed only to the extent of the adjusted basis of the partner's interest in the partnership at the end of the partnership year in which the loss occurred. Petitioner has the burden of proving that he had *153 a sufficient basis in his Area Four Partnership interest to deduct the claimed losses. Elrod v. Commissioner, 87 T.C. 1046, 1080-1081 (1986). This he has totally failed to do. *137 We have summarized in our Findings of Fact petitioner's various versions as to his alleged capital contributions to the partnership. To characterize his testimony as evasive, inconsistent, and generally unworthy of belief would be charitable. We cannot find that petitioner ever contributed anything of value to the Area Four Partnership, assuming that such partnership existed and is to be respected for Federal tax purposes. See n.3, supra. This Court need not accept even uncontroverted testimony if we find it improbable, unreasonable, or questionable. Estate of DeNiro v. Commissioner, 795 F.2d 582, 584 (6th Cir. 1986); Estate of DeNiro v. Commissioner, 746 F.2d 327, 331 (6th Cir. 1984), affg. and remanding on other grounds a Memorandum Opinion of this Court. The record does not establish that petitioner made any contribution to capital. The only other way in which petitioner could acquire a basis in his Area Four Partnership interest would be to prove that the partnership had liabilities in which he either shared as a partner or had assumed personally. Under sections 722 and 752, a partner's basis in his partnership interest is increased *138 by his share or assumption of partnership liabilities. Elrod v. Commissioner, 87 T.C. at 1081-1082. On this record, the only possible candidates for such liabilities are certain Government loans. Those Government loans were certain disaster relief loans that petitioner and/or Hi-Way of Arizona obtained from the Farmers Home Administration of the United States Department of Agriculture (the FHA-USDA loans). Petitioner insists that the loans were made to him individually, rather than to Hi-Way of Arizona. However, any evidence pointing that way merely reflects petitioner's habit of disregarding the separate legal existence of his controlled corporation, Hi-Way of Arizona, and of B. J. Ranch, the limited partnership in which Hi-Way of Arizona was the general partner. To petitioner it was all his money and his farm. Based on all the facts surrounding these FHA-USDA loans as detailed in our Findings of Fact above, we conclude that in substance and in form, the FHA-USDA loans were made to Hi-Way of Arizona, not to petitioner, individually. We so conclude despite the fact that under FHA-USDA regulations such an emergency relief loan could not be made to a corporation *139 or to a partnership such as B. J. Ranch in which a corporation has a controlling interest, since a corporation is not considered by the FHA-USDA to be a farmer. Also, petitioner did not own any land or have any leasehold interest in any land, and was not engaged in farming in his individual capacity. That the FHA-USDA loans may have been illegally or improperly made according to FHA-USDA regulations and standards does not affect their status as loans for Federal tax purposes. Apparently, the bankruptcy of petitioner and of the B. J. Ranch intervened before the problem of the illegal or ineligible FHA-USDA loans could be resolved by that agency. The record does not indicate whether the FHA-USDA loans could be or were discharged in either bankruptcy proceeding, but their ultimate fate has no bearing on the issues before the Court. We have found that the FHA-USDA loans were made to Hi-Way of Arizona. If petitioner had any liability on these loans, any such liability related to petitioner's role with Hi-Way of Arizona or the B. J. Ranch Partnership. These loans were never a liability either of petitioner as a partner of the Area Four Partnership or of the Area Four Partnership, and *140 thus cannot provide any basis in his putative partnership interest. Moreover, deductions from gross income are a matter of legislative grace, and a taxpayer bears the burden of proving his entitlement to them, and the proper amount of any such deductions. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Gatlin v. Commissioner, 754 F.2d 921, 923-924 (11th Cir. 1985), affg. a Memorandum Opinion of this Court. In this case petitioner has the burden of proving that the Area Four Partnership incurred losses, and the amount of those losses. He has presented no evidence to substantiate the claimed losses and, hence, has not carried his burden and is not entitled to deduct any losses. [4]
*141 In summary, petitioner has not substantiated the Area Four Partnership losses that he claimed. He also has not proved that he had any basis in his interest in that partnership during 1977 or 1978, so he is not entitled to deduct any such losses in any event. *154 As to the negligence addition under section 6653(a), petitioners bear the burden of proof on that issue. Bixby v. Commissioner, 58 T.C. 757 (1972). They have not carried that burden, and respondent's determination under section 6653(a) is sustained.[5]
To reflect the foregoing, Decision will be entered for the respondent. Footnotes
*. Petitioners were divorced on December 27, 1979.↩
1. The terms "Area Four Partnership" and "Section Four Partnership" are used interchangeably in the various documents in the record. However, for consistency and to avoid confusion between the legal description and petitioner's numbering by development sequence, we use the term "Area Four Partnership."↩
2. The $ 262 adjustment to petitioners' itemized deductions for 1975 was not mentioned at trial or on brief, and we assume petitioners have conceded this item. In any event there is no evidence in the record to establish any error in that adjustment.↩
3. We are satisfied that the so-called Area Four Partnership or Section 4 Partnership was a sham and lacked any economic substance. That purported partnership was little more than a figment of the imagination of petitioner, his accountant, and his then counsel to try to enable petitioner to deduct on his personal tax returns expenses incurred by his essentially controlled corporation, Hi-Way of Arizona, or by the B. J. Ranch Partnership, in which Hi-Way of Arizona was the general partner. Petitioner candidly admitted as much in his deposition in the case brought by one of the B. J. Ranch limited partners. Petitioner's testimony in this Court was less candid and indeed unworthy of belief. However, this case can be disposed of on other grounds, and we need not further discuss sham or lack of economic substance as such.↩
4. The Area Four Partnership had no bank account and no books or records. No probative evidence was produced to substantiate any claimed losses. At trial his counsel asked petitioner whether the figures on the Area Four Partnership returns were "correct to your knowledge" and he responded "Yes, sir." This is not substantiation. Tax returns are merely statements of the taxpayer's claims and do not establish the truth of the facts contained therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957). Moreover, petitioner did not demonstrate that he had any personal knowledge about any of the figures on those returns.
5. On brief they argue that they thought that they could file a joint return because the divorce decree had not yet been "recorded." There is no factual support for that argument in the record. Moreover, the partnership loss carryover claimed on their 1979 return amply justifies the negligence addition in this case. The Area Four Partnership was a sham and petitioner Robert A. Goodman knew or should have known that.↩